# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **INSITE PLATFORM PARTNERS, INC.,** **et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) ) | **No. 3:19-cv-00250** |
| **COMTECH MOBILE DATACOM CORP.,** | ) ) ) ) | |
| **Defendant.** | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Plaintiffs North American Satellite Corporation ("NASCorp"), Richard Humphrey, and NASCorp's assignee, Insite Platform Partners Incorporated ("Insite"), brought this breach of contract action against Defendant Comtech Mobile Datacom Corporation ("Comtech"). On July 23 and 24, 2024, the Court conducted a bench trial on the issues of liability and damages, during which it heard live testimony from NASCorp's and Insite's corporate representative, Richard Humphrey. The parties also submitted agreed designated deposition testimony from eleven unavailable witnesses.[1] Based on the entire evidentiary record before the Court and the parties' arguments, the Court finds that Plaintiffs have not met their burden of persuasion to show by a preponderance of the credible evidence that Comtech is liable for breach of contract. As such, the Court further finds that Plaintiffs are not entitled to any damages.

---

[1] The eleven witnesses who testified by deposition designations were: Christopher Lovin (Doc. No. 142-1); Lujuana Johnson (Doc. No. 142-2); Pia Miranda (Doc. No. 142-3); Richard Harer (Doc. No. 142-4); Robert Kowalski (Doc. No. 142-5); Shane Shuffield (Doc. No. 142-6); Stratis Marneris (Doc. No. 142-7); Tim Armstrong (Doc. No. 142-8); Tim Slifkin (Doc. No. 142-9); Debra Latter (Doc. No. 144-1); and Brian Humphrey (Doc. No. 150-1). Johnson, Miranda, Marneris, and Latter were designated as corporate representatives to testify on behalf of Comtech.

In support of its ruling, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a).

## I.    FINDINGS OF FACT[2]

### A.    Richard Humphrey, NASCorp, and the SkyTracker II

1.    Richard Humphrey developed and patented the "SkyTracker," a device that uses satellite technology to remotely monitor fuel levels inside residential and commercial propane tanks.  (Joint Stip. ¶¶ 1–2; Tr. Vol. 1 at 27).

2.    In 2002, Humphrey formed NASCorp and became the company's CEO.  (Tr. Vol. 1 at 25, 153).

3.    In 2005, NASCorp went to market with the first commercially available version of the SkyTracker—the SkyTracker II.  (Joint Stip. ¶ 3).

4.    NASCorp sold approximately 10,000 SkyTracker II units on its own.  (P. Ex. 161; Tr. Vol. 1 at 35).

### B.    NASCorp and Comtech's 2009 Agreement to Develop the SkyTracker III

5.    In 2008, NASCorp began negotiating with a company named AeroAstro to produce circuit boards for a new version of the SkyTracker.  (Tr. Vol. 1 at 32).

---

[2] The Court's Findings of Fact do not encompass a complete recitation of the record.  Accordingly, the omission of any particular detail in this section should not be construed as the Court's failure to consider that detail or the inferences it would support, but rather, should indicate merely that some details were omitted in the interest of conveying a manageably concise presentation of the relevant evidence and details that the Court considered ultimately dispositive.  Except where the Court discusses differing testimony on a specific issue, the Court has considered and rejected any contrary testimony regarding that matter in favor of the specific fact found.  Last, for ease of reference, the Court will cite to:  (i) the July 23, 2024 trial transcript (Doc. No. 155) as "Tr. Vol. 1," and the July 24, 2024 trial transcript (Doc. No. 156) as "Tr. Vol. 2"; (ii) the deposition designations referenced in supra note 1 as "[Last Name] Dep."; (iii) the exhibits admitted at trial as "P. Ex." for Plaintiffs' exhibits, and "D. Ex." for Defendants' exhibits; and (iv) the parties' Revised Joint Stipulations (Doc. No. 143) as "Joint Stip."

6. Comtech acquired AeroAstro at some point during those negotiations. (Id. at 32–33; Miranda Dep. at 12).

7. On December 4, 2009, NASCorp contracted with Comtech to design and manufacture the third generation of the SkyTracker—the SkyTracker III. (See P. Ex. 2; see also Joint Stip. ¶ 4).

8. Humphrey testified that one of the goals for hiring Comtech was to add new "systems that would reduce both the size and cost of [the] SkyTracker, as well as extend the battery life of [the] SkyTracker from two-and-a-half years to about ten." (Tr. Vol. 1 at 35).

9. NASCorp and Comtech memorialized their agreement in the "SkyTracker III$^{TM}$ Hardware Design, Manufacturing and Product/Services Agreement" (the "2009 Agreement"). (P. Ex. 2).

10. Comtech's manufacturing obligations under the 2009 Agreement were set to expire in December 2012. (Id.; see also Join Stip. ¶ 5).

11. Comtech helped design the new SkyTracker III itself, but it outsourced the manufacturing of the devices to its subcontractors Advanced Assembly and SinotechUSA, Inc. ("Sinotech"). (Joint Stip. ¶ 15).

12. Advanced Assembly manufactured the printed circuit boards to be installed in the SkyTracker III units. (Id.).

13. Sinotech would then take the printed circuit boards from Advanced Assembly and assemble the final SkyTracker product. (Id.).

14. Advanced Assembly and Sinotech were subject to nondisclosure agreements ("NDAs") with Comtech. (P. Ex. 2 at 25–26).

3

15.     In September 2010, NASCorp began selling the first SkyTracker III units in the market.  (Tr. Vol. 1 at 40).

16.     However, initial sales of the SkyTracker III were not as high as NASCorp had hoped.  (See id. at 41).

17.     NASCorp blamed this poor sales performance on Comtech's alleged financial troubles and its failure to fulfill its contractual obligations to produce 1,500 SkyTracker III units every six months.  (Id. at 41–43, 57–58 (Humphrey testifying that Comtech could not produce units to keep up with market demands); see also P. Exs. 2 at 3–4 (2009 Agreement); 3 at 1 (Jan. 4, 2012 Notice of Default).

18.     As a result, NASCorp decided that it would no longer utilize Comtech to develop or manufacture SkyTracker III units moving forward.  (Tr. Vol. 1 at 47–48).

**C.     The 2013 Agreement**

19.     After the 2009 Agreement expired in December 2012, NASCorp and Comtech began negotiating a new agreement that effectively would end their business relationship.  (See Joint Stip. ¶ 6).

20.     As part of these negotiations, Humphrey emailed Comtech, on June 18, 2013, a list of the hardware and software engineering information NASCorp needed from Comtech to continue manufacturing SkyTracker III units itself.  (P. Ex. 10; see also Tr. Vol. 1 at 48).

21.     On June 24, 2013, Comtech's Chief Operating Officer John Fossaceca forwarded Humphrey's list to several Comtech employees, noting:  "Here is a list of Engineering Artifacts we need to turn over to NASCorp by the end of this week."  (P. Ex. 17).

22.     On or around June 25, 2013, NASCorp and Comtech executed the "CONTRACT SETTLEMENT MODIFICATION" agreement (the "2013 Agreement").  (P. Ex. 16).

23.     The 2013 Agreement required Comtech to, among other things: (1) "*release all SkyTracker III engineering drawings and related information to NASCorp*"; and (2) "provide written notice to all subcontractors to work with NASCorp directly upon the execution of this agreement." (P. Ex. 16 at 1 (emphases added)).

24.     In return, NASCorp agreed to "pay a negotiated settlement amount of $54,186.93 to settle all outstanding Comtech invoices dated on or before" April 30, 2013, and to "purchase [Comtech's] remaining inventory of 406" SkyTracker III units "at a unit price of $162 for a total price of $65,772."[3] (Id.).

**D.     Comtech's Collection of SkyTracker III Engineering Files for NASCorp**

25.     In late June 2013, several Comtech employees were involved with gathering and producing the SkyTracker III engineering deliverables that Humphrey requested in his June 18, 2013 email. (See P. Exs. 11, 17).

26.     Ben Clark (a Comtech contract manager who was involved with negotiating the 2013 Agreement) forwarded Humphrey's June 18, 2013 list to Pia Miranda (Comtech's account manager for the NASCorp account) and Rich Harer (a Comtech facilities security officer and production manager) and said "[w]e'd like [to] provide in the next week or so, if possible. I'll handle the NDA part." (P. Ex. 11 at 2; see also Doc. No. 144-1 at 21; Joint Stip. ¶ 7; Harer Dep. at 15–16).

27.     Pia Miranda was responsible for coordinating all of the engineering deliverables that Comtech needed to provide to NASCorp. (Joint Stip. ¶ 7).

---

[3] In October 2013, the parties executed an amendment to the 2013 Agreement that extended NASCorp's deadline to fulfill its payment obligations. (See Joint Stip. ¶ 19; D. Ex. 49). However, Humphrey testified that NASCorp never paid the full $54,186.93 and never purchased all 406 SkyTracker III units because of "cash flow problems." (Tr. Vol. 2 at 139–43).

28. Miranda enlisted Comtech employees Lori Mills, Bill Reidl, Stratis Marneris, and Chris Thorne to collect and compile these engineering deliverables. (Joint Stip. ¶¶ 7–11).

29. Lajuana Johnson (Comtech's senior vice president or vice president of engineering during this time) oversaw and managed these four employees. (Johnson Dep. at 53–54).

30. Lori Mills was responsible for looking through Comtech's "configuration management system"[4] and making a list of what could and could not be found from Humphrey's June 18, 2013 list. (Joint Stip. ¶ 11).

31. Bill Reidl was an engineer responsible for locating and collecting the "hardware engineering" for the SkyTracker III. (Id. ¶ 10).

32. Chris Thorne and Stratis Marneris were engineers responsible for locating and collecting the "software engineering" files for the SkyTracker III. (Id. ¶¶ 8–9).

33. Stratis Marneris delegated to Chris Thorne the task of collecting the software engineering files—including, but not limited to, the source code—from the configuration management system and exporting them onto a CD. (Id. ¶ 12).

34. Chris Thorne collected these software engineering files and had them exported onto a CD. (See Marneris Dep. 35–36; Miranda Dep. at 22).

35. Stratis Marneris then "reviewed" and "verified" the contents of the CD, and he confirmed that "all necessary and important files for the SkyTracker 3 [were] on that CD." (Marneris Dep. at 29, 35, 67–68; see also Joint Stip. ¶ 13).

---

[4] As background, Comtech's configuration management system keeps track of everything that's on file that's the most current." (Miranda Dep. at 20–21; see also Marneris Dep. at 22). Pia Miranda testified that Comtech uses that "system to make sure that everything we deliver is the most current and the most accurate." (Miranda Dep. at 20–21).

6

36.     Pia Miranda separately "audit[ed] the contents of the CD" to make sure the CD contained the items from Humphrey's June 18, 2013 list.  (Miranda Dep. at 34).

37.     She then provided the CD to Comtech's "point of contact [with NASCorp] at that time which was Ben Clark."  (Id. at 18, 34, 36–37; see also D. Ex. 16).

38.     Once Miranda provided the CD to Clark, she never saw the CD again and never had "any conversations with anybody about what ended up being shipped to NASCorp."  (Miranda Dep. at 37, 40–41).

39.     Miranda also did not recall "by which method [the CD] was shipped."  (Id. at 40–41).

40.     Miranda nevertheless testified that:  "I believe" "the shipment of the CD" "was separate from the test fixture," and that "I believe . . . the test fixture was actually shipped directly from Sinotech, not so much from Comtech."  (Id. at 42, 44, Correction Sheet).

**E.     Comtech Claims it Shipped SkyTracker III Engineering Files to NASCorp**

41.     Ben Clark instructed Rich Harer to package and mail the items on Humphrey's July 18, 2013 list.  (See D. Ex. 17).

42.     Shawn Barth (a Comtech contracts director) also emailed Harer stating:  "We want to make sure that all of these documents come to [Comtech] first so that we can pull together a full 'package' to deliver to NASCorp.  I just don't want all of our [subcontractors] sending documents directly to Rick [Humphrey].  I can't image what that would turn into."  (P. Ex. 11).

43.     Harer testified that his role with respect to the 2013 Agreement was to mail "in one package all items collected, . . . including (i) a disc containing the engineering files gathered by Ms. Miranda and the engineering department and (ii) a test fixture," which he described as a "small computer . . . with a receptacle to test the [printed circuit boards] for the SkyTrackers."  (Doc. No. 65-7 (Harer Decl.) ¶ 8; see also Harer Dep. at 7–9, 26).

7

44.     Harer understood that he needed to send the CD and test fixture in one package because the then-acting president and senior vice president of Comtech, Paul Lithgow, told him "it was important to ensure that . . . everything that NASCorp requested was packaged in *one package and shipped in one shipment* so it all arrived at the same time, in the same package, so . . . there would be nothing overlooked and left out."  (Harer Dep. at 8–9 (emphases added); Doc. No. 65-7 (Harer Decl.) ¶ 17).

45.     On July 1, 2013, one of Comtech's contract manufacturers[5] sent Harer a test fixture for the SkyTracker III.  (Harer Dep. at 26–28).

46.     Harer then "packaged up the test fixture" and was just "waiting for the disc to be produced."  (Doc. No. 65-7 (Harer Decl.) ¶ 11; Harer Dep. at 28–29; see also D. Ex. 15).

47.     On July 2, 2013, Harer received a CD from Comtech's engineering team, and someone from engineering told him that all the relevant SkyTracker III engineering documents that NASCorp requested were on that disc.  (Harer Dep. at 39).

48.     Harer claims that when he received the CD "the next day" on July 2, 2013, he "put the disc in with the test fixture."  (Id. at 29).

49.     Harer further claims that on July 2, 2013, he securely packaged the CD, the test fixture, and the laptop together in the same package, sealed the package, and placed the outbound package "by the rollup door, which was secured until such time as UPS arrived."  (Id. at 10, 32–35; see also Doc. No. 65-7 (Harer Decl.) ¶ 12 (confirming that he "placed both (i) the disc containing the engineering deliverables and (ii) the test fixture in the same package").

---

[5] Based on Pia Miranda's testimony, it is likely that Sinotech was the contract manufacturer that sent the test fixture.  (See Miranda Dep. at 44).

50.     Harer was "there when the UPS guy arrived on" July 2, 2013, and Harer "recall[ed] him picking up the box and putting it in his truck." (Harer Dep. at 36).

51.     Later that day on July 2, 2013, Harer emailed Ben Clark, Pia Miranda, and others with UPS tracking information, stating: "I confirmed the address with Sinotech and have shipped the test fixture and DVD as directed." (D. Ex. 17; Harer Dep. at 39–40).

52.     Harer clarified in his declaration, which the Court finds credible, that "the 'DVD' I referenced in that email was the disc containing engineering files as compiled by Ms. Miranda and Comtech's engineering department." (Doc. No. 65-7 (Harer Decl.) ¶ 14).

53.     "The tracking number for that shipment was 1ZR1986X0260104503," and "[a]ccording to the UPS Tracking Information, that shipment was received by NASCorp on July 5, 2013." (Id. ¶¶ 15–16; see also D. Exs. 17–19).

**F.      NASCorp Claims Comtech Never Sent the SkyTracker III Engineering Files**

54.     On July 5, 2013, UPS delivered the Comtech package to NASCorp, and a NASCorp accountant named Julie Holt signed for it.[6] (Tr. Vol. 2 at 125–26; Joint Stip. ¶ 14).

55.     Humphrey was not in his office when UPS delivered the package from Comtech, and no one notified him when the box first arrived. (Tr. Vol. 2 at 125, 155, 157).

56.     Humphrey testified on direct examination that "the box was on my desk when I arrived at my office" on the "morning" of July 5, 2013. (Id. at 124–25).

57.     Humphrey later clarified on cross-examination that he was out of town on a business trip on July 5, 2013, and that he did not see the box in his office until he returned from the trip a week or more later. (Id. at 125, 155–57).

---

[6] Julie Holt did not testify. Humphrey stated that he had not attempted to contact her about "the sequence of events and how the package was handled." (Tr. Vol. 2 at 126).

58.     Regardless, whenever Humphrey returned to the office after July 5, 2013, Julie Holt told him that a box from Comtech arrived and it was on his desk.  (Id. at 157).

59.     Humphrey testified that he went to his office and "[t]he box was there.  It was a little bit rough condition.  It had been beat up, I guess, in shipment, but nonetheless, it was there."  (Id. at 161).

60.     Humphrey then opened the box in the presence of Julie Holt and another NASCorp employee named Chris Trenholme.  (Tr. Vol. 1 at 68).

61.     According to Humphrey, the box had "two pieces in it," consisting of "a little, small, older laptop" and "a test fixture."  (Tr. Vol. 1 at 66, 140; Tr. Vol. 2 at 127, 153; see also P. Ex. 181 (Physical Exhibit)).

62.     Humphrey initially testified that he specifically looked for a CD (or disk) when he first opened the box.  (Tr. Vol. 2 at 127).

63.     But Humphrey later changes his testimony and said that he did "[n]ot specifically" look for a disc when he opened the box.  (Id. at 154–55).

64.     In any event, Humphrey claims he "look[ed] everywhere inside the box" and "took the whole thing out," but there was nothing else in the box.  (Tr. Vol. 1 at 69–70; Tr. Vol. 2 at 153, 163).

65.     Humphrey believes that it was not possible that a CD was in the box.  (Tr. Vol. 1 at 69).

66.     Humphrey then "opened up the laptop and tried to see if there was anything on there that [he] could open up," but there weren't any programs on there that he recognized so he put the laptop back in the box.  (Tr. Vol. 2 at 163).

10

67. Humphrey corrected himself again and testified that NASCorp did not have the capabilities to open the engineering files, look at them, or understand what they are, so it needed help from a company like Advanced Assembly who could review the files. (Tr. Vol. 1 at 68–69).

68. Humphrey just assumed the contents of the box contained the most current SkyTracker III engineering files. (Id. at 121).

69. Humphrey, Julie Holt, and Chris Trenholme then sealed the box back up, and Trenholme took the package to "the warehouse and put it in the locked cage back there behind [Humphrey's] office." (Tr. Vol. 2 at 162–63).

70. Humphrey claims the box remained in the warehouse from July 2013, until approximately April or May 2014. (Tr. Vol. 1 at 70, 71; Tr. Vol. 2 at 163).

71. On July 18, 2013, Humphrey emailed Comtech stating: "I have been out of town when the items arrived," but "[w]e have been going through the engineering items and we have not found the battery count reset." (D. Ex. 24).

72. Pursuant to the 2013 Agreement, Comtech released Advanced Assembly and Sinotech from their NDAs and advised them that they could work with NASCorp directly. (Joint Stip. ¶¶ 16–17).

73. Although NASCorp continued utilizing Sinotech to assemble SkyTracker III units, it eventually chose to hire Creative Electronics and Software, Inc. ("CES") instead of Advanced Assembly to build the circuit boards moving forward. (Joint Stip. ¶¶ 20, 24; see also Tr. Vol. 1 at 71, 101–02).

74. Humphrey testified that in April 2014, he sent CES the contents of the package that Comtech shipped to him so that CES could use it to produce SkyTracker III circuit boards. (Tr. Vol. 1 at 71–72).

75.     On June 4, 2014, Comtech sent Humphrey a "dunning" letter reminding him that NASCorp still owed Comtech $135,404.20 in outstanding invoices. (D. Ex. 65).

76.     On or about June 7, 2014, Humphrey visited CES, and CES informed him that it could not manufacture SkyTracker III circuit boards with just the contents of the package he provided. (Tr. Vol. 1 at 72–73).

77.     Specifically, CES had questions about the operation of the test fixture that they could not answer without certain source code and other relevant engineering files, which CES referred to as an "XY file." (Tr. Vol. 1 at 73, 78; Joint Stip. ¶ 21).

78.     Humphrey told CES that he had given CES everything he received from Comtech. (Joint Stip. ¶ 22).

79.     Sometime later in June 2014, Advanced Assembly provided Humphrey the XY file at his request. (Tr. Vol. 1 at 76, 105).

80.     CES was able to use the XY file to build circuit boards, and Sinotech assembled 300 SkyTracker III units with those boards. (Id. at 103–04, 110–11).

81.     It turns out, however, that those 300 units had "battery drain issues" because the circuit boards were manufactured with an outdated operating system. (Id. at 110–12, 117, 122).

82.     CES determined that it could not fix this battery drainage issue without certain source code from Comtech that it did not have. (See id. at 104, 125, 128).

83.     On June 16, 2014, Humphrey responded to Comtech's June 4, 2014 dunning letter by claiming, for the first time, among other things, that "the necessary and mandatory files to build SkyTrackerTM III were never provided by Comtech" in accordance with the 2013 Agreement. (D. Ex. 67).

84.     In July 2014, CES hired Tim Slifkin from Execution Analytics (a product development firm) to help determine what engineering it needed from Comtech.  (Tr. Vol. 1 at 79).

85.     Slifkin eventually determined that the missing engineering "documents do in fact exist at [Comtech] and have been located.  (P. Ex. 112; Tr. Vol. 1 at 79, 84–85).

86.     In December 2015, Pia Miranda told Slifkin he could come to Comtech's offices and view the original SkyTracker III files in Comtech's possession, but NASCorp would need to first pay $3,629.00 to settle some pending unpaid invoices under the 2013 Agreement.  (Tr. Vol. 1 at 80; Tr. Vol. 2 at 64–65).

87.     Later, in April 2016, Comtech's lawyer sent Humphrey's lawyer an email stating that Comtech would send "the 'engineering drawings and related information' associated with SkyTracker III in its possession *a second time*" if NASCorp settled certain unpaid invoices.   (D. Ex. 169 at 8 (emphases added); see also P. Ex. 116).

88.     Humphrey testified that he did not accept this proposal because he did not want to pay Comtech more money "[t]o get our original engineering that we should have gotten years ago," and NASCorp already had claims for "damages by this time."  (Tr. Vol. 1 at 141–42).

89.     To that end, Plaintiffs claim they have been damaged by Comtech's alleged failure to send the SkyTracker III engineering files in several ways, including by:  (i) having to pay money to build SkyTracker III units that did not work because of outdated engineering; (ii) paying travel costs to recover and remove faulty SkyTracker III units from propane tanks; (iii) losing monitoring fees that NASCorp would have received if the SkyTracker III units functioned properly; (iv) losing sales that NASCorp would have made if the SkyTracker III units in its inventory functioned

properly; and (v) being forced to borrow $4,000,000.00 from shareholders to keep NASCorp afloat. (Tr. Vol. 2 at 5–39, 100; P. Ex. 137).

###### G. **Procedural History**

90.    On March 26, 2019, Plaintiffs sued Comtech for damages arising out of Comtech's alleged violations of the 2013 Agreement and the Lanham Act. (Doc. No. 1).

91.    The case proceeded through discovery, after which the Court initially granted Comtech's motion for summary judgment and dismissed all of Plaintiffs' remaining claims. (Doc. No. 77).

92.    On appeal, the Sixth Circuit affirmed dismissal of Plaintiffs' Lanham Act claims but reversed the Court's grant of summary judgment on Plaintiffs' breach of contract claim. (Doc. No. 111 at Page: 16).

93.    Thus, on remand, the only claim remaining for trial was Plaintiffs' Tennessee law claim against Comtech for breach of the 2013 Agreement.

94.    The parties each filed proposed findings of fact and conclusions of law (Doc. Nos. 145, 147) and post-trial briefs (Doc. Nos. 160–61), and Plaintiffs filed a separate supplemental brief on damages (Doc. No. 148).

## II.    **CONCLUSIONS OF LAW**

95.    The credible persuasive evidence does not establish that Comtech breached the 2013 Agreement.

96.    To succeed on a claim for breach of contract under Tennessee law, a plaintiff must prove the following three elements by a preponderance of the evidence: (1) "the existence of a valid and enforceable contract," (2) "a deficiency in the performance amounting to a breach," and (3) "damages caused by the breach." Fed. Ins. Co. v. Winters, 354 S.W.3d 287, 291 (Tenn. 2011).

97.     It is undisputed that the 2013 Agreement was a "valid and enforceable contract" between NASCorp and Comtech.  (See Joint Stip. ¶ 6).

98.     Accordingly, this Court need only decide whether Comtech breached the 2013 Agreement, and if so, whether Plaintiffs are entitled to damages.

99.     A breach of contract occurs when one party fails or refuses to do something that it promised to do under the parties' agreement.  See Winters, 354 S.W.3d at 291.

100.    Plaintiffs argue that Comtech is liable for breaching the 2013 Agreement because it failed to "release all SkyTracker III engineering drawings and related information to NASCorp." (See Doc. No. 137 at 3; P. Ex. 16).

101.    The Sixth Circuit held that the term "release" in the 2013 Agreement required Comtech to send or "*transfer*" these files to NASCorp.  (Doc. No. 111 at Page: 13); see also United States v. Moored, 38 F.3d 1419, 1421 (6th Cir. 1994) (holding that "[t]he law of the case doctrine . . . generally preclude[s] a lower court from reconsidering an issue expressly or impliedly decided by a superior court.").

102.    Comtech argues that it did not breach the 2013 Agreement because it shipped a CD containing "all SkyTracker III engineering drawings and related information to NASCorp" on July 2, 2013, whereas Plaintiffs argue that Comtech did breach the 2013 Agreement because the package that Comtech had delivered to NASCorp on July 5, 2013, did not contain a CD.

103.    It is worth emphasizing what Plaintiffs are *not* arguing.  Plaintiffs do not dispute that Comtech's employees located and compiled some (if not all) of the requested SkyTracker III software deliverables from its "configuration management" system and exported those software files onto a CD.  (See Joint Stip. ¶¶ 7–13).  Nor do Plaintiffs contest whether the CD itself contained "all SkyTracker III engineering drawings and related information."  If this were Plaintiffs' theory

of breach, which it is not, then the Court would need to make findings of fact regarding what files the CD contained and whether those files were sufficient to satisfy Comtech's obligations under the 2013 Agreement. (See P. Ex. 6 at 1). But because Plaintiffs do not attack the sufficiency of the CD (mainly because they claim NASCorp never received it), the Court need not engage in that analysis here.

104. Accordingly, this case boils down to a relatively narrow dispute for the Court to resolve: Did Comtech place a CD with SkyTracker engineering files in the package it sent to NASCorp on July 2, 2013? If Comtech placed the CD in the box, then it cannot be liable for breach of contract because the box was in fact delivered to NASCorp. But if Comtech did not place the CD in the box, then it is liable for failing to "release" the necessary files, and the Court must assess Plaintiffs' resulting damages.

105. "In a bench trial, it is the trial court's job to assess the credibility of witnesses and weigh the evidence." Neal v. Berghuis, 2006 WL 2270036, at *5 (E.D. Mich. Aug. 8, 2006).

106. In doing so here, the Court considers the testimony from Rich Harer, Richard Humphrey, and Pia Miranda, as the parties agree that these three people were the ones who testified about (i) what Comtech delivered to NASCorp, and (ii) what NASCorp received. (See Tr. Vol. 2 at 185, 189). No one else from Comtech purported to testify from personal knowledge about these issues, and no testimony was offered from the other two individuals from NASCorp who allegedly witnessed Humphrey open the box (Julie Holt and Chris Trenholme).

107. As the Court explained above, Harer testified logically, in detail and consistently, from personal knowledge about how he (on behalf of Comtech) shipped NASCorp a package containing a laptop, a SkyTracker III test fixture, *and a CD containing SkyTracker III electronic files*.

108.     Specifically, Harer testified that his role with respect to the 2013 Agreement was to obtain "a disc containing the engineering files gathered by Ms. Miranda and the engineering department," obtain a "test fixture" from one of Comtech's subcontractors, and ship those items to NASCorp "in one package" by July 2, 2013.  (See Doc. No. 65-7 (Harer Decl.) ¶ 8; Harer Dep. at 8–9).

109.     Harer explained that he personally "packaged up the test fixture" when he received it on July 1, 2013, but he waited to seal the package until he received the CD with SkyTracker III engineering files from Pia Miranda's engineering team "the next day."  (Harer Dep. at 29, 39).

110.     When Harer received the CD containing the engineering deliverables on July 2, 2013, he placed the CD, the test fixture, and the laptop together in the same package, sealed the package, placed the outbound package for pickup by UPS, and saw the UPS driver pick up the package and place it in his truck.  (Harer Dep. at 10, 32–35; see also Doc. No. 65-7 (Harer Decl.) ¶ 12).

111.     Harer is "confident that [he] shipped the disc containing engineering deliverables to NASCorp along with the test fixture in the same package," particularly because Comtech's then-President, Paul Lithgow, told him "it was important to ensure that . . . everything that NASCorp requested was packaged in one package and shipped in one shipment so it all arrived at the same time."  (Doc. No. 65-7 (Harer Decl.) ¶ 18; Harer Dep. at 8–9).

112.     Harer then verified that he shipped the CD and test fixture as directed, which is reflected in his contemporaneous email to Ben Clark, Pia Miranda, and others on July 2, 2013.  (D. Ex. 17).

113.     The Court has carefully considered Harer's testimony and finds it credible.

114.     The Court also considered Humphrey's testimony (on behalf of Plaintiffs) that when he received the package on July 5, 2013, he only found a laptop and a test fixture, but *not a CD containing any SkyTracker III files*.

115.     Unlike with Harer's testimony, however, the Court observed Humphrey's body language and demeanor in the courtroom and has serious concerns about the tone and tenor of his testimony, his evasiveness, and his inconsistent statements.  The Court has considerable pause about the believability of Humphrey's testimony.

116.     For example, Humphrey testified inconsistently about the critical issue of when he first saw the box in his office—initially stating that he saw it on the morning of July 5, 2013, but later stating that he did not see it until at least a week later when he returned from a business trip. (Tr. Vol. 2 at 124–25, 155–57).

117.     Humphrey also testified inconsistently about what he looked for when he first opened the box—initially stating that he specifically looked for a disc, but later stating that he did "[n]ot specifically" look for a disc.  (Tr. Vol. 2 at 127, 154–55).

118.     The Court has also considered evidence about Humphrey's potential motivations to provide false testimony in this case, which included his large economic incentives, that he did not formally accuse Comtech of breaching the 2013 Agreement until after Comtech sent its "dunning" letter, and his company's "pattern of nonpayment, blame, and threatened litigation" against other companies that worked with NASCorp in the past.  (See Doc. No. 161 at 7).  The Court cannot pinpoint how much anyone or more of these motivations contributed to Humphrey's

18

overall testimony, but because the Court must consider all of the evidence, these motivations persuade the Court that Humphrey's testimony more likely than not is to some degree biased.[7]

119. The Court will not go as far as to say Humphrey was entirely incredible, but his testimony certainly was not *more* credible than all of the other credible evidence at trial.

120. Plaintiffs nevertheless urge this Court to accept Humphrey's version of events, and to reject Harer's testimony, because Pia Miranda testified that she believed there were separate shipments made to NASCorp under the 2013 Agreement—one shipment with the test fixture, and another shipment with the CD. (See Miranda Dep. at 42–49, Correction Sheet). Plaintiffs rely heavily on Pia Miranda's statements to argue that NASCorp only received the test fixture package, not the separate CD package.

121. The Court does not find credible Pia Miranda's testimony about "separate" shipments. As an initial matter, she admitted she did not have personal knowledge about this issue. Specifically, because she was "not involved in putting the CD into an envelope" or "putting together a shipping label on the envelope to ship out," she did not know how the CD was shipped, and she never had "any conversations with anybody about what ended up being shipped to NASCorp." (Miranda Dep. at 37, 40–41). The Court finds that Pia Miranda was more likely than not merely speculating about what likely happened after she gave the CD to Ben Clark.

122. Even more, her suggestion that there were "separate" shipments stemmed from her mistaken belief that Sinotech was responsible for shipping the test fixture directly to NASCorp. (Miranda Dep. at 44–45). The evidence in the record contradicts her belief because Shawn Barth

_____

[7] The Court was perplexed with Humphrey's separate testimony that a gang of former judges and senators in Goodlettsville, Tennessee (referred to as the "Gang of 20") was conspiring against him to take down his business. (Kowalski Dep. at 111–15; Tr. Vol. 2 at 138, 140–153). Suffice it to say this did not support giving Humphrey's testimony more weight.

specifically told Harer to "make sure that all of these documents," including the test fixture, come to [Comtech] first" because he did not want Comtech's subcontractors sending documents directly to Humphrey. (P. Ex. 11). Harer also testified credibly that he received the test fixture from one of Comtech's subcontractors, and that he personally placed the test fixture and CD together in one box.

123. Plaintiffs also attempt to discredit Harer's testimony because Pia Miranda suggested Ben Clark—rather than Harer—was the one who shipped the CD. (Doc. No. 160 at 6; Miranda Dep. at 49). The Court again disagrees because the evidence clearly shows that Harer was responsible for shipping the package to NASCorp.

124. In fairness, Pia Miranda's testimony also tends to bolster Harer's testimony in a few areas, including that she was sure Comtech "ended up delivering" the CD to Humphrey. (Miranda Dep. at 26). But because Miranda was not speaking from personal knowledge when she testified about these topics, the Court ascribes little weight to her testimony on these issues.

125. For these reasons, the Court does not find Pia Miranda credible on the issue of whether the shipment of the CD was separate from the shipment of the test fixture.

126. Plaintiffs also argue that the Court should discredit Harer's testimony because CES and Execution Analytics independently confirmed that "Comtech had not provided the full set of required deliverables." (See Doc. No. 160 at 4–5). That is not true. CES and Execution Analytics simply analyzed *what Humphrey gave CES*. (Tr. Vol. 1 at 71–72). No one from CES or Execution Analytics had any personal knowledge about what was in or not in the box that Comtech shipped to NASCorp on July 2, 2013, and no one from CES or Execution Analytics witnessed Humphrey open the box on July 5, 2013. Accordingly, the Court does find that this evidence in any way discredits Harer's testimony.

127. At bottom, the Court has carefully considered all of the evidence, the arguments of counsel, the testimony of all of the witnesses (including Humphrey's live testimony at trial and the deposition testimony from all eleven unavailable witnesses), the applicable law, and the relevant portions of the record. And after considering all these things, the Court is left with two irreconcilable accounts of whether Comtech shipped NASCorp a CD with SkyTracker III engineering files on July 2, 2013.

128. There is no question that Plaintiffs bear the burden of proving the elements of their breach of contract claim by a preponderance of the evidence, meaning they must prove it is "more likely true than not true" that Comtech failed to ship NASCorp the CD. See Bruin v. Swank, 2025 WL 289679, at *11 (W.D. Ky. Jan. 24, 2025).

129. The Court concludes only that Plaintiffs have not met their burden of proof to show Comtech breached the 2013 Agreement. See id.

## III. CONCLUSION

For the foregoing reasons, the Court finds that Comtech is not liable to Plaintiffs for breach of the 2013 Agreement.

An appropriate Order will enter.


_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE